UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | S1 23 Cr. 331 (LAK) |
| BASHIRU GANIYU, | |
| Defendant. | |

**THE GOVERNMENT'S
SENTENCING MEMORANDUM**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Danielle Kudla
Matthew Weinberg
Assistant United States Attorneys
    *- Of Counsel -*

**TABLE OF CONTENTS**

FACTUAL BACKGROUND ........................................................................................................1

I.     The Enterprise ................................................................................................................1

II.    Ganiyu's Role as a Money Launderer for the Enterprise .......................................3

III.   Victims of the Enterprise ............................................................................................5

IV.   Ganiyu's Prior Federal Criminal Trial and Detention for Depositing a
Fraudulent Check ..........................................................................................................6

PROCEDURAL HISTORY AND TRIAL ...............................................................................8

GUIDELINES CALCULATION ..............................................................................................9

DISCUSSION ............................................................................................................................10

I.     The Nature, Circumstances, and Seriousness of the Offense Warrant a
Significant Sentence ...................................................................................................10

II.    A Sentence of 10 Years is Necessary to Protect the Public and for Specific
Deterrence ...................................................................................................................15

III.   A Significant Sentence is Necessary for General Deterrence ..............................17

IV.   A Sentence of 10 Years is Necessary to Avoid Unwarranted Sentencing
Disparities ...................................................................................................................18

CONCLUSION ..........................................................................................................................21

The Government respectfully submits this memorandum in advance of sentencing for defendant Bashiru Ganiyu, scheduled for November 18, 2024.  On April 23, 2024, the defendant was convicted following a jury trial of one count of the following:  conspiracy to commit wire fraud and mail fraud, conspiracy to commit money laundering, conspiracy to receive stolen money, and receipt of stolen money.  In the Presentence Investigation Report ("PSR"), the Probation Office ("Probation") calculates a range pursuant to the United States Sentencing Guidelines (the "Guidelines") of 210 to 262 months' imprisonment and recommends a sentence of 210 months' imprisonment.  The defendant does not object to the calculation of the Guidelines and has requested an unspecified sentence below the Guidelines range.  The Government concurs with Probation's Guidelines calculation of 210 to 262 months' imprisonment.

For the reasons set forth below, a sentence of 120 months would be sufficient but not greater than necessary to achieve the legitimate purposes of sentencing.

## FACTUAL BACKGROUND

### I.    The Enterprise

Ganiyu was a member of a criminal enterprise based in West Africa which engaged in a series of frauds against individuals and businesses located across the United States (the "Enterprise").  The frauds perpetrated by the Enterprise have consisted of, among other things, business email compromises and romance scams.  (PSR ¶ 12).

The Enterprise conducted the business email compromise scams through the spoofing of email accounts.  (PSR ¶ 13).  Specifically, the Enterprise used slight variations of legitimate email addresses of employees of a company or third parties engaged in business with the company to trick employees of the company into thinking the fake email accounts were authentic.  The fake email accounts were then used to send fake documents and instructions to wire money to certain bank accounts.  By using this method of deception, the Enterprise tricked victims into transferring

money to bank accounts the victims believed were under the control of legitimate recipients of the funds, when in fact the bank accounts were under the control of members of the Enterprise.  (*Id.*).

The Enterprise conducted the romance scams by using electronic messages sent via email, text messaging, or online dating websites that tricked the victims—many of whom were intentionally targeted because they were vulnerable, older men and women, who lived alone and often had substantial savings based on their years of employment, savings, and investments—into believing the victim was in a romantic relationship with a fake identity assumed by members of the Enterprise.  (PSR ¶ 14).  Once the Enterprise had gained the trust of the victims, they used false pretenses such as a shipment of gold or receiving a portion of an inheritance to cause the victims to send money to bank accounts that the victims believed were controlled by their romantic interests, when in fact the bank accounts were controlled by members of the Enterprise.  At times, the Enterprise also used false pretenses to cause the victims to (unknowingly) receive fraud proceeds into the victims' bank accounts, and to transfer those funds to accounts under the control of members of the Enterprise.  (*Id.*)

The Enterprise was able to successfully execute these scams based on the highly coordinated efforts of numerous international co-conspirators, including so-called "Fraud Boys," "Middlemen," and U.S.-based money launderers.  (PSR ¶ 15).  The  Fraud Boys typically operated from Ghana and were responsible for spoofing business email accounts and/or contacting and communicating with romance scam victims.  The Middlemen also typically operated from Ghana, and were responsible for providing the Fraud Boys with bank account information for U.S.-based money launderers and for instructing the U.S.-based money launderers where to send fraud proceeds.  The U.S.-based money launderers were responsible for opening business bank accounts that were used to receive fraud proceeds and then to launder those fraud proceeds consistent with

instructions received from the Middlemen.  In most cases, the U.S.-based money launderers would be instructed by the Middlemen to send the fraud proceeds on to other U.S.-based money launderers or to international companies that sold consumer goods, such as automobiles and household items.  (*Id.*).

## II.    Ganiyu's Role as a Money Launderer for the Enterprise

The defendant was a U.S.-based money launderer for the Enterprise.  (PSR ¶ 17).  Ganiyu primarily laundered fraud proceeds for the Enterprise through business bank accounts he opened and controlled in the name Gani LLC—a false business that he created for the purpose of laundering money for the Enterprise.  (PSR ¶ 18).

From at least 2020 through 2022, Ganiyu had ten business accounts in the name of Gani LLC, along with five personal accounts, at eight different banks (collectively, the "Ganiyu Accounts").  (PSR ¶ 19).  The Ganiyu Accounts received deposits totaling approximately $11,961,838.56 from more than 40 victims of the Enterprise – including more than $9 million in wire transfers and nearly $2 million in check deposits.  (*Id.*; *see also* GX 901).[1]  On multiple occasions, the defendant opened the business accounts under the guise that he was operating a local trucking company in the Bronx.  For much of the period when Ganiyu claimed to be operating his New York City trucking business, which he described to banks as "trucking, pickup, [and] movers services," Ganiyu was residing abroad in Ghana.  (PSR ¶ 19).

Bank records, including account opening documents, bank statements, check images, and wire transfer records, demonstrate Ganiyu's money laundering activity.  (PSR ¶ 20; *see also* GXs 801-817, 901, 1001-1015).  Within days of receiving fraud proceeds, Ganiyu transferred the funds out of his accounts, typically to another U.S.-based money launderer for the Enterprise named Fred

---

[1] Citations to "GX" numbers refer to Government exhibits introduced at trial.

Asante,[2] or to international goods companies.  (PSR ¶ 20; GX 901).  The defendant accepted and moved these funds with the knowledge that he was receiving stolen victim money—often from vulnerable victims—as part of his role in the Enterprise.  In exchange for his efforts as a money launderer for the Enterprise, the defendant withdrew in cash or paid for personal expenses totaling approximately $620,656.66 from the fraud proceeds.  During the period of the charged conspiracy, from in or about January 2020 to in or about July 2022, this amounts to approximately $20,000 per month derived from stolen victim money.  (PSR ¶ 20).

Between 2020 and 2022, all fifteen Ganiyu Accounts were closed.  During this period, Ganiyu was told by at least two banks—East West Bank and TD Bank—that his bank accounts were closed due to suspected fraud activity.  (PSR ¶ 21).  For example, on April 30, 2020, a TD Bank representative informed Ganiyu that the bank was terminating its banking relationship with him "[d]ue to the claims of fraud we received for the wires into your business account[.]"  Less than a week later, the TD Bank representative informed Ganiyu that the bank had "received another claim of fraud," regarding a separate wire transfer from the same victim, specifically, Paul Gruszecki.  When East West Bank and TD Bank asked for documentation to support the legitimacy of Ganiyu's financial transactions, Ganiyu repeatedly lied, falsely claiming that the transactions were legitimate and forwarding victim emails, which Ganiyu knew had been obtained by the Fraud Boys based on false pretenses and material misrepresentations.  (*Id.*).

During the course of the fraud scheme, Ganiyu also took steps to conceal his receipt of fraud proceeds.  In particular, Ganiyu concealed the receipt of fraud proceeds from the United States Internal Revenue Service ("IRS").  Specifically, between 2020 and 2022, Ganiyu claimed a

---

[2] Asante was separately charged for his participation in the Enterprise and pled guilty to conspiracy to commit money laundering.  *See* 21 Cr. 88 (JSR).  On May 18, 2022, Judge Rakoff sentenced Asante principally to 108 months' imprisonment.

total of approximately $135,000 in gross receipts for Gani LLC with no additional sources of income. (PSR ¶ 81; GX 902). In practice, however, bank records established that the Ganiyu Accounts received nearly $12,000,000 in deposits during the same period.[3] (PSR ¶ 19).

## III.    Victims of the Enterprise

In total, more than 40 victims of the Enterprise sent fraud proceeds to the Ganiyu Accounts. (PSR ¶ 19). Four of those victims testified at trial: Dennis Powell, Randy Von Allmen, Paul Gruszecki and Kenny Jones. In general, these witnesses testified as follows.

- Dennis Powell is a 71-year-old man in Texas, who entered into an online relationship with "Valerie," who purported to be a single mother, in her mid-thirties, residing in Florida. Powell met "Valerie" on Senior FriendFinder, a dating platform that catered to individuals 50 and older. Based on requests from "Valerie" and her various representatives for assistance obtaining her father's inheritance, Powell sent approximately $1.4 million from his retirement savings account to members of the Enterprise. Of this amount, Powell sent $325,000 to Ganiyu in two transactions. The funds were never recovered. (PSR ¶ 23.a).

- Randy Von Allmen is a 63-year-old man in Florida, who entered into an online relationship with "Joyce," who purported to be in her mid-thirties, residing in Florida, and working in the elder care business. "Joyce" began communicating with Von Allmen after a particularly vulnerable period following the loss of Von Allmen's wife to cancer after more than twenty years of marriage. Based on requests from "Joyce" and her various representatives for assistance obtaining a family inheritance, Von Allmen sent more than $600,000 to members of the Enterprise. Of this amount, Von Allmen sent $282,000 to Ganiyu in four transactions. The funds were never recovered. Von Allmen postponed his retirement plans, in part, because of the money he was tricked to sending to members of the Enterprise. (PSR ¶ 23.b).

- Paul Gruszecki is a 67-year-old man in Illinois, who entered into an online relationship with "Esther," who purported to be a single mother, in her mid-thirties, residing in Ghana. Based on requests from "Esther" and her various representatives for assistance obtaining her father's inheritance, Gruszecki sent approximately $800,000 from his retirement savings account to members of the Enterprise. Of this amount, Gruszecki sent $248,750 to Ganiyu in eight transactions. The funds were never recovered. Gruszecki testified that the money he sent to the Enterprise was "pretty much

---

[3] According to the PSR, the defendant reported to Probation that he earned approximately $85,000 annually in connection with the "moving company" that he operated named Gani LLC. (PSR ¶ 76). The evidence at trial, however, established that Gani LLC was created for the sole purpose of laundering criminal proceeds and had no legitimate sources of income.

everything I had." He was forced to sell his home as a result of the funds lost to the Enterprise. (PSR ¶ 23.c).

- Kenny Jones is a 63-year-old man in Mississippi, who entered into an online relationship with "Florence," who purported to be in her mid-thirties, religious, and residing in South Africa. Based on requests from "Florence" and her various representatives for assistance obtaining her father's inheritance, Jones sent approximately $2,000,000 from his retirement saving account and a friend's account, to members of the Enterprise. Of this amount, Jones sent $1,384,240 to Ganiyu in 21 transactions. The funds were never recovered. Jones testified that the money he sent to the Enterprise was "[e]very bit of [his] 401(k) and what [he] had saved up through the years," after more than 40 years of work. (PSR ¶ 23.d).

The testifying witnesses were certainly not the only victims of the Enterprise who sent funds to the defendant. For example:

- Victim-1 is a 52-year-old woman in New York, who entered into an online relationship with "Brian," who purported to be a single father with a sick daughter, residing in Florida. Based on requests from "Brian" for assistance paying for his daughter's medical treatments, Victim-1 sent approximately $1,000,000 to members of the Enterprise. Of this amount, Victim-1 sent $417,000 to Ganiyu in seven transactions. The funds were never recovered. (PSR ¶ 23.e).

- Victim-2 was a 75-year-old man at the time of his death. Approximately two years before his death in December 2022, Victim-2 entered into an online relationship with "Kendra," who purported to be deaf and residing in Kansas. Based on requests from "Kendra" for assistance with her start-up business, Victim-2 sent at least $571,000 to Ganiyu in four transactions through a business account. These funds were never recovered. According to Victim-2's family members, Victim-2's primary source of funds at this time were his retirement account and residual income generated from a former business. During the time of his online relationship with "Kendra," his retirement funds were depleted to the point where he could not afford a $5,000 deposit for his independent living home, which he borrowed from his ex-wife. (PSR ¶ 23.f).

## IV.    Ganiyu's Prior Federal Criminal Trial and Detention for Depositing a Fraudulent Check

On October 29, 2013, Ganiyu was arrested in connection with narcotics charges. He was later charged in Indictment S1 13 Cr. 874 with three counts of conspiracy to distribute heroin; specifically, two counts in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), and one count

in violation of 21 U.S.C. § 846, 841(a)(1), 841(b)(1)(B).  Ganiyu was initially released on bail pending trial.

In February 2015, Ganiyu was acquitted of the narcotics charges after a jury trial. However, prior to trial, on or about January 6, 2015, the Government requested that the defendant's bail be revoked pending trial based on probable cause that the defendant committed a crime while on release.  (*See* 13 Cr. 874 (CM), Dkt. 93).  Specifically, the Government informed the Court that, on October 3, 2014, the defendant received a $12,000 check from an elderly individual in Missouri ("Victim-1") in his Wells Fargo bank account.  (*Id.* at 2.)  Two days prior to the receipt of Victim-1's check, the defendant's account balance was negative $44.59.  (*Id.*)  On October 22, 2014, the defendant made a $11,000 cash withdrawal from the same account.  (*Id.*)  Victim-1 informed law enforcement that she never met the defendant, did not write the check, and had recently been the victim of more than $12,000 in unauthorized credit card charges.  (*Id.*).

On January 6, 2015, the defendant appeared before Judge McMahon for a pretrial conference and bail hearing (the "Bail Hearing," *see* GX 1201-R).  At the Bail Hearing, the Government represented the general facts regarding the circumstances of the check deposit and withdrawal.  In response, the defendant's counsel, on behalf of his client, stated that the defendant did not know the woman whose name appeared on the check.  (GX 1201-R at 13.)  Defense counsel further stated that the defendant received the check from an individual in Nigeria "that he met through the Internet" through a "friend in common," who asked the defendant to purchase a car on his behalf.  (*Id.*)  After hearing from the parties, Judge McMahon stated:

> So what I have here is a situation where I am required by law to detain a defendant who is on pretrial release if I find that there is probable cause — you know what that standard is, to believe that the defendant has committed a crime, a federal, state or local crime while on release. I have been presented with evidence tending to show that a woman, an elderly woman, in St. Louis, Missouri, was a victim of credit card fraud was cheated — it turns out it was a Discover Card was cheated out of

$12,000, a not insignificant sum of money which was paid to the order of the defendant, Mr. [Ganiyu] who received the check. It does not bear the name of the person who was allegedly buying the car or for whom he was allegedly buying the car. That doesn't seem to have bothered him in the slightest. He put the money in his bank account. I believe that there is probable cause to believe that Mr. [Ganiyu] has participated in this fraudulent scheme and he is remanded.

(*Id.* at 14-15.)

Ganiyu remained detained until his acquittal at trial over a month later.

## PROCEDURAL HISTORY AND TRIAL

On July 6, 2023, Ganiyu was arrested and charged with one count of the following: conspiracy to commit wire fraud and mail fraud, in violation of 18 U.S.C. § 1349, conspiracy to receive stolen money, in violation of 18 U.S.C. § 371, wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, mail fraud, in violation of 18 U.S.C. §§ 1341 and 2, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  Ganiyu was detained pending trial and has remained in custody since his arrest.[4]

In March 2024, approximately one month before trial, a grand jury returned a four-count superseding indictment.  The superseding indictment removed the substantive wire fraud and substantive mail fraud charges, and added a substantive charge for receipt of stolen money, in violation of 18 U.S.C. §§ 2315 and 2.

Ganiyu proceeded to trial, which began with jury selection on Tuesday, April 16, 2024.[5] On April 23, 2024, Ganiyu was convicted on all four counts of the superseding indictment.

---

[4] The defendant initially consented to detention without prejudice to making a bail application.  On August 15, 2023, Magistrate Judge Figueredo held a bail hearing and denied bail.  The defendant appealed the bail determination to Your Honor, who denied it in a written order dated August 28, 2023.  *See United States v. Ganiyu*, 2022 WL 8224703 (S.D.N.Y. Aug. 23, 2023).  The defendant then appealed the bail determination to the Second Circuit.  The Second Circuit denied the bail application after oral argument. *See United States v. Ganiyu*, 23-7091 (2d Cir. 2023), Dkt 41.1.

[5] Opening statements and witness testimony began on Friday, April 19, 2024.

## GUIDELINES CALCULATION

Probation correctly calculates an offense level of 37 and Criminal History Category of I, resulting in a Guidelines range of 210 to 262 months' imprisonment. The defendant does not object to this calculation of the Guidelines.

Specifically, the PSR concludes that Count One (conspiracy to commit wire fraud and mail fraud), Count Three (conspiracy to receive stolen money), and Count Four (receipt of stolen money) are grouped pursuant to U.S.S.G. § 3D1.2(d) because the offense level is determined largely on the basis of the harm or loss. Those counts are then grouped with Count Two (conspiracy to commit money laundering) pursuant to U.S.S.G. § 3D1.2(c). *See* U.S.S.G. § 2S1.1, Application Note 6 ("In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of §3D1.2…"). Because the highest offense level is produced by the conspiracy to commit money laundering count, U.S.S.G. § 2S1.1 is the applicable Guideline. *See* U.S.S.G. § 3D1.3(a).

Pursuant to U.S.S.G. § 2S1.1(a)(1), the base offense level is the offense level for the underlying offense from which the laundered funds were derived – specifically, wire fraud – because the defendant committed the underlying offense (or would be accountable for the underlying offense as relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(1)(A), and the offense level for the wire fraud offense can be determined.

The base offense level is therefore 33, calculated by using the base offense level of seven for wire fraud, *see* U.S.S.G. § 2B1.1, and adding 20 levels because the loss exceeded $9.5 million but did not exceed $25 million (§ 2B1.1(b)(1)(K)), adding four levels because the offense resulted in substantial financial hardship to five or more victims (§ 2B1.1(b)(10)(B)), and adding a two-level increase because a substantial part of the fraudulent scheme was committed from outside the

9

United States, specifically, Ghana. There is also a two-level enhancement to the base offense level pursuant to U.S.S.G. § 2S1.1(b)(2)(B), because the defendant was convicted under 18 U.S.C. § 1956, and a two level enhancement because the defendant knew or should have known victims of the offense were vulnerable victims, namely, elderly men and women. The result is an offense level of 37.

The defendant has no prior criminal convictions, and therefore has zero criminal history points and is in Criminal History Category I.

An offense level of 37 and Criminal History Category I results in a Guidelines range of 210 to 262 months' imprisonment.

## DISCUSSION

A criminal sentence must be crafted, among other things, to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and deter future criminal conduct. *See* 18 U.S.C. § 3553(a)(2). Applying the Guidelines and taking into account all of the factors set forth in 18 U.S.C. § 3553(a), as fully set forth below, a sentence of 10 years' imprisonment is necessary to reflect the seriousness of the defendant's crimes, to promote respect for the law, to provide just punishment for the defendant's criminal conduct, to adequately deter criminal conduct from others and the defendant, and to protect the public from further crimes of the defendant.

**I.    The Nature, Circumstances, and Seriousness of the Offense Warrant a Significant Sentence**

A sentence of 10 years' imprisonment is necessary to reflect the extremely serious nature of Ganiyu's conduct and to provide just punishment for the offense. As explained above, Ganiyu served an integral role in the Enterprise as a U.S.-based money launderer. Absent U.S.-based

money launderers like the defendant, the Enterprise was unable to receive and launder millions of dollars of fraud proceeds obtained from victims across the United States.

Based on information known to the Government, Ganiyu was a member of the conspiracy for at least two-and-a-half years between January 2020 and July 2022. (PSR ¶ 19.) Over this period, Ganiyu opened and maintained 10 business accounts at 8 different banks as part of his money laundering operation. (*Id.*) The reason Ganiyu had so many accounts is because they were regularly being closed by banks due to the fraud. Ganiyu was persistent, however, in opening new accounts to continue his money laundering operation after they were closed. By August 2022, all the Ganiyu Accounts, which included five personal accounts, had been closed. (PSR ¶ 20; GX 901).

While Ganiyu represented to financial institutions that Gani LLC was involved in legitimate business such as transportation and logistics and car exports, in reality Gani LLC was simply a front used to receive funds stolen from victims and launder them to co-conspirators based in Ghana. (PSR ¶ 19). But Ganiyu did not only receive fraud proceeds under the guise of a legitimate business; he also laundered that money back to Ghana through large purchases of food products, cars, and other products which were shipped to Ghana and sold, resulting in "clean" largely untraceable money that was distributed to Asante's coconspirators in the Enterprise. (PSR ¶¶ 15, 19; GXs 801-817, 901). This trade-based money laundering scheme was specifically designed to obscure the origin of the fraud proceeds and was successful in concealing the identity of the ultimate beneficiaries of these schemes. (PSR ¶¶ 15, 19). Indeed, the Government is not aware of any legitimate purpose for Ganiyu's business and has not identified any legitimate transactions in his accounts.

In total, the Ganiyu Accounts had deposits that totaled approximately $11.9 million during the approximately two-and-a-half-year period from January 2020 through August 2022. (GX 901). To date, the Government has been able to determine that Ganiyu received millions in fraud proceeds from more than 40 victims through his Ganiyu Business Accounts. (Trial Tr. 102-106; GX 901.) Ganiyu made a profit of at least approximately $620,656.66, which amounts to approximately $20,000 per month derived from stolen victim money. (PSR ¶ 20). None of which he reported on his U.S. income tax returns. (GX 902).

As described above, this extensive conduct by Ganiyu over approximately two-and-a-half years in laundering nearly $12 million in fraud proceeds from more than 40 victims and conspiring with others to do the same is extremely serious. (GX 901; PSR ¶ 23). Real victims, many of whom were vulnerable older men and women, were hurt by the crimes committed by the defendant and his role in the conspiracy, which was integral to committing the frauds and getting the money to co-conspirators in Ghana. (*See* PSR ¶ 23; Trial Tr. 28, 200-201, 150, 157-159). The impact statements submitted in this case by victims who sent money to Ganiyu demonstrate the lasting harm caused by his criminal conduct.[6] For example:

- James Randall Von Allmen, who testified at trial, wrote: "In July of 2021 I lost my wife to cancer. . . . She was my one and only, my best friend and confidant for more than 22 years. In October of 2021, I decided to try to make new friends and created several online profiles to introduce myself. I was very open about being recently widowed with no children and wanted to genuinely make some new friends, and develop new relationships . . . . Joyce seemed nice and very friendly . . . My heart went out to her easily as I was emotionally vulnerable and lacked other close friendships to connect with . . . . Joyce and I developed what I thought was a genuine, caring relationship for more than a year, exchanging pictures and text messages. . . . After coming to the realization Joyce wasn't the person she pretended to be, I had a complete emotional breakdown. I was

---

[6] The Government is submitting a set of eleven Victim Impact Statements as Exhibit A to this submission. Statements 6-13 included in Exhibit A were initially provided to the Government and submitted to the Court in advance of sentencing for defendant Joshua Ntella Bissah, and are being resubmitted in connection with this sentencing.

in bed for several days and lost 15% of my body weight.  I can't begin to describe how her betrayal affected my sense of trust and the emotional scars it's left on me.  Unfortunately, the depression, anxiety, shame, and isolation I still feel will probably accompany me the rest of my life.  By far, the worst psychological impact has been my loss of self-esteem and self-worth." (Ex. A, Statement 13).

- Dennis Powell, who testified at trial, wrote:  "The fraud ring of which Mr. Ganiyu was a part defrauded me of $1,600,000 in a romance scam. . . . the romance scam perpetrated by Mr. Ganiyu and his associates cost me my marriage, my properties, and my retirement savings.  I am now homeless and live with family members. . . . I am laden with $200,000 in debt that I struggle to payoff.  I have two adult daughters.  They are both disgusted with me for my involvement in a romance scam; they have severed ties with me and no longer respond to my attempts to communicate with them.    This emotional hurt is indescribable.  I can payoff debt, possibly find a place to live, but repairing the relationship with my daughters seems beyond possibility.  [Mr. Ganiyu] has certainly destroyed my life, and I expect he has had destructive effect on scores of other victims.  Many of his effects on the lives of his victims cannot be reversed." (Ex. A, Statement 1).

- Kenny Jones, who testified at trial, wrote: "The impact of this crime?  Basiclly [sic], this crime ruined my life!  I am 63 years old this month.  I was scammed out of all my 401k retirement, about $500K, and any other money I had and earned myself . . . .I've worked hard all my life, have 3 kids  and 3 grandchildren.  I have nothing left to retire on and nothing left to leave my kinds once I am gone from this earth . . . .  I pray daily for justice and restitution to be made." (Ex. A, Statement 3).

- A woman who is the daughter of a victim who sent money to Gani LLC and co-conspirator accounts wrote:  "As far as we can tell, my father lost close to $1 million in Bashiru Ganiyu's scam.  The impact of losing that much money sems obvious:  that is healthcare, college tuition, and more for my dad, his children, and his grandchildren.  But, Mr. Ganiyu, what you may not have recognized is the much deeper and more distressing results of your actions . . . . you stole time from my father's life.  You increased strain on my relationship with my father, which can never be repaired because he is dead and gone. . . . You preyed on a confused man, and in turn preyed on his family. . . . You continued to make him think he was involved in a financially and emotionally lucrative relationship.  You continued to isolate him from his family and friends who did not support his so-called relationship.  You stole so much more than money." (Ex. A, Statement 4).

- A victim who sent money to Gani LLC and co-conspirator accounts wrote: "As a result of this scam I was forced to file bankruptcy.  I remortgaged my home

to get the funds and utilized all my savings along with maxing out all my credit cards." (Ex. A, Statement 9).

- A victim who sent money to Gani LLC and co-conspirator accounts wrote: "As a result of this deception I have had to move from my apartment. I am in debt consolidation program . . . . I have pretty much lost everything. I have no car or assets whatsoever. I couldn't afford storage for my things so I sold all at dirt cheap prices and gave many things away for free just to empty my apartment." (Ex. A, Statement 11).

- A victim who sent money to Gani LLC and co-conspirator accounts wrote: "I'm embarrassed that my good intentions could become a scam. . . . I was deeply hurt and scared to share it with my grown children, who I have raised by example, and this kindness backfired on me. . . . I'm seventy-five, and the hard-earned money I have lost isn't extra money I could afford to lose over the deliberate actions of those taking advantage of the elderly." (Ex. A, Statement 2).

- A victim who sent money to Gani LLC and co-conspirator accounts wrote: "I suffered a great deal because I went through mental and emotional stress . . . . The mental, emotional, and financial distress caused me to become very ill and affected my work life and my personal life." (Ex. A, Statement 6).

- A victim who sent money to Gani LLC and co-conspirator accounts wrote: "This scam has cost me all of my life savings, and I always thought it was legitimate . . . . Obviously, I have been damaged significantly in this scam." (Ex. A, Statement 8).

The fact that Ganiyu may not have been the one regularly communicating with these vulnerable victims provides no relief to the devastating and life-altering consequences. Nor should it diminish the consequences of his participation in the Enterprise. As Samuel Boateng's trial testimony made clear, which was corroborated by testimony from the TD bank representative and Ganiyu's own emails concerning Paul Gruszecki—the U.S.-based money launders, including Ganiyu, were well aware of the lies that were being told by the Fraud Boys to victims like Von Allmen, Powell, Jones, and Gruzecki. (Trial Tr. 154-155, 166-177; GX 237, 622, 1501, 1504, 1510). Ganiyu and his co-conspirators knew that the Fraud Boys talked to victims "for several hours to gain their trust and affection" with the goal of "extract[ing] and trick[ing] and tak[ing]

14

monies from them." (Trial Tr. 158). The stories of gold inheritances and assistance to African orphanages, (Trial Tr. 159 and 170), were strategically peddled out to elderly victims. This particular class of victims was targeted because they often had amassed wealth after years of work and pensions, had available time for daily communication, and were often susceptible to the feelings that accompany new love, including a sense of deep trust and satisfaction in feeling needed in someone's life. While Ganiyu may not have been the individual weaving the tale of falsities to the romance scam victims, he knew exactly what was occurring each time a victim's deposits were received into one of his many business accounts—accounts that were *essential* to the furtherance of the Enterprise. (Trial Tr. 161-162 (describing the importance of a "one-hop money launderer")).

For these reasons, the seriousness of Ganiyu's conduct and the need to provide just punishment warrant a sentence of ten years' imprisonment.

## II.    A Sentence of 10 Years is Necessary to Protect the Public and for Specific Deterrence

A sentence of ten years' imprisonment is also necessary for specific deterrence. Despite being on notice from a district court judge as early as 2015 and receiving repeated warnings from banking institutions that his actions were fraudulent, Ganiyu did nothing to change his conduct. In particular, between 2020 and 2022, eight different banks closed all 15 Ganiyu Accounts. (PSR ¶ 21; GX 901 at 28). During this period, Ganiyu was expressly told by at least two banks—East West Bank and TD Bank—that his bank accounts were closed due to suspected fraud activity. (PSR ¶ 21). When East West Bank and TD Bank asked for documentation to support the legitimacy of Ganiyu's financial transactions, Ganiyu repeatedly lied, falsely claiming that the transactions were legitimate and forwarding victim emails, which Ganiyu knew had been obtained by the Fraud Boys based on false pretenses and material misrepresentations. (*Id.*)

But perhaps most concerningly, in addition to repeated warnings from banks, Ganiyu was on notice in 2015 from Judge McMahon that substantially similar conduct was indicative of fraud. As discussed above, in January 2015, Ganiyu was detained pending trial in connection with unrelated narcotics charges (of which he was ultimately acquitted) when the Government presented facts to Judge McMahon that the defendant had committed a new crime while on pretrial release. Judge McMahon not only detained the defendant for this conduct, but specifically stated that, in her view, the facts presented to her – which the defendant did not meaningfully dispute – were indicative of fraud. (GX 1201-R at 14-15).

Despite these repeated warnings and serious consequences, including prior incarceration, Ganiyu chose to engage in fraud time and time again over the course of the conspiracy between 2020 and 2022. For each deposit that he received into his Ganiyu Accounts—totaling nearly $12 million—Ganiyu knew that he was taking money from countless victims across the United States. Ganiyu, however, did not care. He did not care about the financial and emotional impact that it had on the many vulnerable victims nor was he deterred by the minimal amount of time he received as a result of his pretrial remand. There can be only one explanation for this: greed. The massive amounts of money going through Ganiyu's accounts--approximately $12 million, more than $600,000 of which he withdrew in cash or used to pay personal expenses—demonstrate that he would not be satisfied with earning a modest living from legitimate employment. Rather, he kept opening bank accounts as fast as they were closed, and successfully made himself a dependable money launderer for the Enterprise in the United States. And he did all of this despite knowing full well the consequences of continuing to commit serious federal crimes. Accordingly, a

substantial sentence is necessary to discourage Ganiyu from committing further crimes and to impress upon him the serious consequences of his criminal conduct.[7]

### III.    A Significant Sentence is Necessary for General Deterrence

A sentence of ten years' imprisonment is also appropriate to ensure adequate general deterrence and to promote respect for the law.  A substantial prison sentence is necessary to send a message to other similarly situated individuals—both in the United States and abroad—and the public that participating in business email compromises and romance scams in any capacity, and laundering proceeds from those frauds, will not be treated leniently and will entail a significant period of incarceration.  Such a message is particularly important at a time when such crimes, which are often difficult to prosecute, have become commonplace.   Indeed, in a February 2023 report, the Federal Trade Commission estimated that romance scams in the United States have resulted in losses of over $3.8 billion between 2019 and 2022; in 2022 alone, nearly 70,000 people reported a romance scame, and reported losses reached $1.3 billion.[8]  The Better Business Bureau reported that "the number of reported romance scam cases has already more than doubled in the first two months of the year [2022] when compared to the same period last year."[9]  Further, based on data collected by the FBI, in 2020 alone, U.S. victims lost a total of approximately $1.8 billion

---

[7] To this day, Ganiyu appears to be telling falsehoods about his conduct.  As indicated in the PSR, Ganiyu reported to Probation that he earned $85,000 annually in connection with the operation of his "moving company," Gani LLC.  (PSR ¶ 76).  But that figure is both too low and too high.  The actual amounts flowing into the Gani LLC accounts each year were significantly higher than $85,000, but the Government has not identified any income earned in connection with the operation of a moving business – and Gani LLC's own tax returns do not lend any support to this self-serving statement.  (PSR ¶ 81).  Specific deterrence is especially important where, as here, the defendant continues to mislead about his crimes and is likely to recidivate absent a significant sentence.

[8]    *See*    https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2023/02/romance-scammers-favorite-lies-exposed (last visited Nov. 10, 2024).

[9] https://www.bbb.org/article/scams/17012-bbb-tip-romance-scams (last visited Nov. 10, 2024).

to business email compromises.[10]  It is therefore important that those who would consider engaging in these forms of criminal conduct understand that the consequences will be serious.  Accordingly, a substantial sentence of ten years' imprisonment is both necessary and appropriate to promote general deterrence and respect for the law.

## IV.    A Sentence of 10 Years is Necessary to Avoid Unwarranted Sentencing Disparities

Among the factors a sentencing court must consider in imposing sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Congress adopted Section 3553(a)(6) "to eliminate unwarranted disparities nationwide." *United States v. Williams*, 524 F.3d 209, 215 (2d Cir. 2008).  The PSR notes that sentencing data from the last five years shows that the average sentence for a defendant sentenced under the money laundering Guidelines with offense level (37) is approximately 11 years' imprisonment.  Because of the range of potential white-collar crimes that fall under the Guidelines in Section 2S1.1, which is based on the loss amount under the Guidelines in Section 2B1.1, the Government submits that a more focused approach is necessary to avoid unwanted sentencing disparities.  Specifically, the Government submits that it is important for the court to consider the 30-month sentence imposed by this Court on co-conspirator Joshua Ntella Bissah and the nine-year sentence imposed by Judge Rakoff on co-conspirator Fred Asante when determining the appropriate sentence for Ganiyu.  (*United States v. Fred Asante*, 21 Cr. 88 (JSR), ECF No. 114).

---

[10] *See* https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf (last visited Nov. 10, 2024).

On December 14, 2023, the Court sentenced co-conspirator and fellow U.S.-based money launder Joshua Ntella Bissah to 30 months' imprisonment.  There are several distinguishing factors, however, between Bissah and Ganiyu.  First and foremost, Bissah accepted responsibility for his wrongdoing.  As the Court noted at sentencing, Bissah "seem[ed] to [the Court] to be genuinely owning up to [his] responsibility here and that [he was] remorseful."  (Bissah Sent. Tr. at 9).  As a result of Bissah's self-reflection and remorse, the Court found that his "likelihood of recidivism is lower than usual[.]"  (*Id.* at 10).  No similar circumstances exist here where Ganiyu has yet to take any responsibility for his actions or show any signs of remorse.  Additionally, Bissah was significantly less culpable than the defendant.  Bissah was held responsible for a loss of approximately $1.6 million suffered by more than ten victims.  (Bissah PSR ¶ 52; ECF No. 37 at 4).  By contrast, the Ganiyu bank records make clear that he should be held responsible for a loss of approximately $11,744,115.07[11] suffered by more than 40 victims.  (PSR ¶ 19; GXs 801-817, 901).  By any measure—loss amount, number of victims, or acceptance of responsibility—Ganiyu's conduct is magnitudes times worse than Bissah's conduct.

In terms of culpability, co-conspirator Fred Asante is more comparable to Ganiyu.  As the trial made clear, Asante was a central co-conspirator in the defendant's crimes.  Boateng testified that Asante—utilizing Asante's fraudulent company Fog Logistics LLC—was one of the Enterprise's leading U.S.-based money launders, who was used to move millions of dollars of victim money from the United States back to Ghana often through international good purchases.  (Trial Tr. 136, 143, 152, 165-66).  Ganiyu's bank records established that Ganiyu sent

---

[11] Although the PSR cites deposits totaling $11,961,838.56 into the Ganiyu Accounts, the Government is seeking to hold the defendant account for loss and forfeiture purposes in the amount of $11,744,115.07.  This amount represents the total deposits into the Ganiyu Business Accounts, (GX 901), which were the primary accounts used to further the fraud scheme, (Trial Tr. 161).

approximately $1,166,959 over the course of 59 transactions between 2020 and 2022 to Asante and Fog Logistics LLC.  (GX 901 at 15).  In fact, Asante was the largest withdrawal recipient from the Ganiyu bank accounts, (*id.*), which is particularly notable considering that Asante was arrested and detained in February 2021.  (21 Cr. 88 (JSR), ECF Nos. 2, 28).  Asante used Ganiyu, along with other U.S.-based money launders, as a "one-hop" money launder, whose primary purpose was to receive victim, and thereafter, transfer the fraud proceeds to Asante in a layering process designed to further conceal the source of funds.  (Trial Tr. 166-167). Time and time again, Ganiyu received victim money in the form of wire transfers and check deposits.  Within days, Ganiyu transferred nearly identical amounts on to either Asante or to international goods companies at the direction of Ganiyu's co-conspirators operating as Middlemen for the Enterprise.  (Trial Tr.  159-164; GXs 203, 207, 208, 210-213, 216, 239, 242, 244-247, 251, 252, 256-258, 901).

On May 18, 2022, Judge Rakoff sentenced Asante to nine-years imprisonment after pleading guilty to conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h). (21 Cr. 88 (JSR), ECF Nos. 111, 114).  Although Asante was the top U.S.-based money launder for the Enterprise, whose bank accounts had deposits that totaled approximately $36.24 million between September 2016 through January 2021, (of which, only $6.7 million was traced to identified fraud proceeds from more than 80 victims), ((21 Cr. 88 (JSR), ECF No. 111 (Gov't's Sent. Sub. at 1, 3, and 5)), Asante pled guilty and accepted responsibility for his conduct.  By contrast, to this day, Ganiyu has not accepted any responsibility for his essential role in these very serious crimes that drastically impacted the lives of so many vulnerable victims.  When considering this significant distinguishing factor, along with the undisputable facts that from 2020 to 2022, Ganiyu opened ten business accounts, at eight different banks that received deposits totaling approximately $11,744,115.07 from more than 40 victims, (*see* GX 901), and was on notice since

2015 that this conduct was indicative of fraud, a sentence of 10 years is appropriate here and would be consistent with sentences of other defendants engaged in similar conduct.

## CONCLUSION

In view of all of the facts and factors set out above, Ganiyu is deserving of a significant sentence proportionate to his role in this serious and long-running, international fraud scheme that targeted some of the most vulnerable victims. While a Guidelines sentence—which would exceed 17 years—is not necessary, the Government urges the Court to impose a sentence that underscores the serious nature of the harm to dozens victims; strives to prevent the defendant from ever again committing fraud; and sends a powerful signal to others—many of whom are located abroad in Ghana and elsewhere—who might be tempted to engage in these crimes that the consequences will be severe. A sentence of 10 years would serve such purposes.

Dated: New York, New York
      November 12, 2024

                Respectfully submitted,

                DAMIAN WILLIAMS
                United States Attorney for the
                Southern District of New York

By:       /s/
                Danielle Kudla
                Matthew Weinberg
                Assistant United States Attorneys
                (212) 637-2304/2386